**Albert J. MILLER, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. C–90–3132 MHP.**

United States District Court, N.D. California.

Sept. 15, 1992.

716

Jon B. Sigerman, Theodore A. Kolb, Sullivan Roche & Johnson, San Francisco, CA, for plaintiff.

William T. McGivern, Jr., U.S. Atty., Jay R. Weill, U.S. Atty's Office, Tax Div., San Francisco, CA, for defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

PATEL, District Judge.

This matter arises out of an international withholding tax audit conducted by the Internal Revenue Service ("IRS") under 26 U.S.C. § 1441 against Albert Miller as withholding agent for A–Alphatronics, Inc.. The IRS recommended withholding tax liability in excess of $10,000,000 and additional penalties in excess of $6,000,000.

## BACKGROUND

This case presents issues involving sections 7432 and 7433 of the Internal Revenue Code, which were enacted as part of the so-called "Taxpayer Bill of Rights" in the Technical and Miscellaneous Revenue Act of 1988, Pub.L. No. 100–647, Secs. 6240–6241. Sections 7432 and 7433 allow taxpayers to bring civil actions in the United States district courts to recover damages from the government when an IRS officer or employee knowingly or negligently fails to release a lien (section 7432) or recklessly or intentionally disregards any provision of the Internal Revenue Code or any regulation promulgated thereunder (section 7433).

Section 7432, entitled "Civil Damages for Failure to Release Lien," provides in pertinent part:

(a) *In General.*—If any officer or employee of the Internal Revenue Service knowingly, or by reason of negligence, fails to release a lien under section 6325 on property of the taxpayer, such taxpayer may bring a civil action for damages against the United States in a district court of the United States.

(b) *Damages.*—In any action brought under subsection (a), upon a finding of liability on the part of the defendant, the defendant shall be liable to the plaintiff in an amount equal to the sum of—

(1) actual, direct economic damages sustained by the plaintiff which, but for the actions of the defendant, would not have been sustained, plus

(2) the costs of the action.

Section 7433, entitled "Civil Damages for Certain Unauthorized Collection Actions," provides in pertinent part:

(a) *In General.*—If, in connection with any collection of Federal tax with respect to a taxpayer, any officer or employee of the Internal Revenue Service recklessly or intentionally disregards any provision of this title, or any regulation promulgated under this title, such taxpayer may bring a civil action for damages against the United States· in a district court of the United States. Except as provided in section 7432, such civil action shall be the exclusive remedy for recovering damages resulting from such actions.

(b) *Damages.*—In any action brought under subsection (a), upon a finding of liability on the part of the defendant, the defendant shall be liable to the plaintiff in an amount equal to the lesser of $100,-000 or the sum of—

(1) actual, direct economic damages sustained by the plaintiff as a proximate result of the reckless or intentional actions of the officer or employee, and

(2) the costs of the action.

The government concedes that the assessment made on September 4, 1989 against plaintiff was erroneous. It should not have been made on that date because a notice of deficiency (90–day letter) had not been sent to the plaintiff before the assessment was made. The notices of tax lien that had been filed on May 1 and 17, 1990 were released on July 27, 1990 and the assessments were abated on August 30, 1990.

Plaintiff contends that the government is liable for damages under sections 7432 and 7433. The government claims it is not liable for damages because no officer or employee of the IRS knowingly, or by reason of negligence, failed to release a lien under 26 U.S.C. § 6325 or recklessly or intentionally disregarded any provision of the Internal Revenue Code in connection with the collection of the taxes assessed against plaintiff.

This matter was tried before the court on March 23–25, 1992. The trial related solely to the issue of whether the United States is liable to the plaintiff for damages under the provisions of 26 U.S.C. §§ 7432· and 7433. The court hereby enters its findings of fact and conclusions of law as to plaintiff's claims. To the extent that any findings of fact are included under conclusions of law they shall be deemed findings of fact, and to the extent that any conclusions of law are included under findings of fact they shall be deemed conclusions of law.

## FINDINGS OF FACT

1. The plaintiff is a tax shelter·promoter who used Hong Kong entities to claim

certain alleged research and development deductions on numerous partnership returns. Ex. B–16. The IRS began to audit the plaintiff's tax shelter partnerships in 1982. In 1982 Jon Tamaki, an IRS international examiner, was assigned to examine the international tax aspects of the audit that the IRS was conducting of the partnerships controlled by the plaintiff. Tamaki did not formally begin his audit until 1984, after the conclusion of the domestic phase of the audit. The focus of his audit was whether the $33,928,000 sent to Hong Kong by fifty seven partnerships formed by plaintiff was subject to withholding taxes under 26 U.S.C. § 1442 because it was United States source income sent to a foreign recipient. If the plaintiff was liable for such taxes, then he was required to file a U.S. Annual Return of Income Tax To Be Paid at Source (Form 1042). Ex. B–20.

2. Tamaki is a specialist employed by the IRS to investigate transactions involving foreign entities. Cases are referred to international examiners by domestic revenue agents if issues involve foreign entities. As soon as an international examiner completes his investigation, the case is referred back to the domestic revenue agent group which had referred the case to the international examination group. The international examiner or his group has no responsibility or authority to close out or process a case once he completes his audit. Only a domestic revenue agent has that responsibility.

3. Tamaki's audit was initiated in 1982. Both Edward Mevi and Lawrence Brookes filed Powers of Attorney concerning this matter. In a letter dated November 6, 1986, Brookes contacted Tamaki inquiring whether Tamaki needed any additional materials to complete the audit. Ex. A–10. In a telephone conversation in early December, 1986, Brookes requested a closing conference if a tax were to be assessed against plaintiff. Tamaki never contacted Brookes thereafter.

4. Tamaki completed his report on June 30, 1987 and recommended that withholding taxes under section 1442 be assessed against plaintiff at 30% of the research and development contract amounts for each of the years 1976 through 1980. Ex. B–16. Tamaki based this recommendation, among other reasons, on the fact that "the taxpayer has not and will not provide the proper books and records or information to support his position." Ex. B–16 at 56. The report concluded that "the entire series of transactions with all the entities created by A.J. Miller are considered sham. . . . None . . . are considered arm's length." Ex. B–16 at 56. Tamaki then prepared various IRS internal processing forms for purposes of closing the case out of his international examination group for transfer back to the domestic revenue agent group.

5. Tamaki was aware that plaintiff's tax counsel, Lawrence Brookes, did not agree with the imposition of the withholding taxes under section 1442 against his client and that Brookes intended to appeal the matter to the IRS appeals division. Tamaki included that fact in the transmittal form he prepared when he transferred his report to his group manager. Ex. A–30; Form 4665. It was Tamaki's understanding that the domestic revenue agent group which had referred the case to him would issue a 30–day letter and that the taxpayer would file a protest and the matter would be transferred to the appeals division for further review and an attempt to settle the case.

6. Tamaki's report was reviewed by a reviewer on July 9, 1987 for purposes of technical accuracy. The reviewer proposed certain adjustments and Tamaki made those adjustments to his report on August 27, 1987. The reviewer also stated in his report that he expected the appeals division to review the case. Ex. A–30; Form 3990.

7. No copies of this report were sent to either Miller or his attorneys. No one from the IRS made any effort to contact Miller or his attorneys to set up a closing conference.

8. The IRS took no further action on this report from August 27, 1987 until June or July of 1989, when someone from the IRS discovered the report in San Francisco. Defendants cannot explain what happened to the report during those two years, al-

though interest and penalties accrued against Miller during this period.

9. Tamaki had no further involvement in the matter from August 27, 1987 until June or July of 1989, when the group manager of the international examination group in the San Jose District, Donald Kihara, showed Tamaki a box containing Tamaki's original report and workpapers which had been sent to Kihara by the group manager of the international examination group in San Francisco. Tamaki told Kihara to send it to a domestic revenue agent group for processing. The original domestic revenue agent group that had originally referred the case to Tamaki in 1982 no longer existed, so the case had to be assigned to a new group for it to be processed.

10. Tamaki did not keep track of the case after he completed his report because he had a large caseload that included multinational corporations, of which many involved potential assessments of tax much larger than the Miller audit, although the Miller audit was the largest potential assessment of personal tax that he had handled. Tamaki had no knowledge of what happened to his report between August 27, 1987 and June or July of 1989 when Kihara spoke to him. After completing a report, there is nothing for Tamaki has nothing to do with a case unless he is asked by an appeals officer or government attorney to respond to something the taxpayer filed or did.

11. Kihara is the group manager of the international examination group in the San Jose IRS District. Prior to June, 1989 there was no international examination group in San Jose, so all referrals regarding international tax issues were sent to the San Francisco District.

12. In June of 1989 Kihara received a phone call from the international examination group manager in the San Francisco District, Dough Kuntz. He told Kihara that he had located the Miller file in San Francisco and that it needed to be closed. They decided the case should be closed in the San Jose District because Miller resided and worked within that district.

13. Since the international group is only a specialty group within the Examination Division, they have no control over tax returns. The processing of cases can only be initiated by a domestic revenue agent group who would cause 30 and 90–day letters to be sent out. The international examination group manager or agent who wrote the report does not review either the 30 or 90–day letters either before or after they are sent out by the processing or support units responsible for sending out such letters.

14. Kihara then asked Jean Janich, a group manager of a revenue agent group, if she would process the Miller case. She agreed. Kihara made no suggestion as to how Janich should process the case. Kihara had no involvement in the case again until May, 1990 when Brookes called him seeking a copy of the notice of deficiency on the assessment that had been made on September 4, 1989. When he spoke with Brookes in May, 1990, Kihara had no reason to believe that 30 and 90–day letters had not been sent to Miller before the assessment was made. Although he had not seen the 90–day letter, he assumed it had been sent out and told Brookes he would attempt to locate a copy of the notice.

15. Janich is a group manager of a domestic revenue agent group in the San Jose IRS District. She had twelve revenue agents under her supervision in 1989. Each domestic revenue agent group has a support function which prepares all 30 and 90–day letters. Janich had no authority to prepare or send out such letters. Only the processing unit can perform those functions.

16. In June or July of 1989, Janich took control of the Miller case for purposes of closing it out. She intended that it be sent to the appropriate examination support and processing group to send out the 30 and 90–day letters. She assigned the matter to a revenue agent in her group, Ann Reuter, in order to research the procedures that needed to be performed to close the case since it involved the filing of 1042 tax returns. Neither Janich, Reuter, nor any

other domestic revenue agent in the San Jose District had ever before processed a case involving a 1042 tax return.

17. Both Janich and Reuter discussed the matter with the manager of the processing group in the San Jose District who told both of them that all 1042 tax returns must be sent to the Philadelphia Service Center for processing. Janich also personally looked at the IRS Manual which directed that all 1042 tax returns be sent to the Philadelphia Service Center for processing. Ex. A–29. The administrative file was sent by Janich to the Philadelphia Service Center on July 26, 1989 and received by the service center on August 16, 1989. Ex. A–12.

18. Janich believed that the Philadelphia Service Center would process the 1042 tax returns in the proper manner which included sending 30 and 90–day letters to the taxpayer before any assessment was made. Janich made the decision to send the 1042 tax returns to the Philadelphia Service Center for processing based upon her review of the Internal Revenue Manual, the research conducted by Reuter, and conversations she and Reuter had with the manager of the processing function.

19. Reuter then filed all the appropriate internal processing forms and gave them to the secretary along with the administrative file to be sent to the Philadelphia Service Center. Reuter assumed that the Philadelphia Service Center would properly process the case by first issuing both 30 and 90–days letters. She did not prepare the internal processing forms that went along with the administrative file to the Philadelphia Service Center any differently than if the case was being closed out by the San Jose processing group. Moreover, the internal processing forms are filled out the same way whether they involve 1040 or 1042 tax returns.

20. The Philadelphia Service Center received the administrative file on August 16, 1989. It did not issue either a 30 or 90–day letter. Nor did anyone return the administrative file to the San Jose District for purposes of mailing such letters. Instead, on September 4, 1989, it assessed tax liabilities against the plaintiff as were originally proposed by Tamaki's report.

21. The IRS made no person-to-person contact with the plaintiff with respect to the collection of the taxes assessed on September 4, 1989 until April 26, 1990. Between those two dates the only attempt at collection was made by the Philadelphia Service Center, which mailed four sets of notices to the plaintiff. The first set was dated September 4, 1989, and the second set was dated October 16, 1989. Exs. B–1, B–2. Both notices were mailed to plaintiff's mail drop.

22. Plaintiff picked up both notices sometime during October, 1989. He asked his attorney, Mevi, to make inquiries about the notices.

23. Mevi called the Philadelphia Service Center on October 31, 1989 and spoke to a telephone service representative named Robert Rentka. Rentka informed Mevi that Rentka could find no computer record of the assessment made against Miller. In fact, the name Albert Miller did not even appear in the computer records that Rentka reviewed as he spoke to Mevi. Mevi reported back to Miller that the Philadelphia Service Center could find no computer record of Miller or the assessment. Mevi did not request that Rentka abate the assessment or release any liens. Mevi also told plaintiff's attorney Brookes and plaintiff's accountant Pierre Korsmoe that the Philadelphia Service Center had no computer record of Miller or any assessment having been made against him. Mevi ceased representing Miller within a few days after the October 31, 1989 phone call to Rentka.

24. Rentka did not tell Mevi during their phone conversation that the notices Miller had received were in error or wrong; that Miller could ignore the notices; or that Rentka would abate the assessments. Mevi left his name and number and asked Rentka to call him if he found anything more. He made no other request to Rentka.

25. Mevi did not tell Miller that the notices had been issued in error and that he could ignore them or that anyone in the IRS had told Mevi that they were issued in

error and could be ignored. Mevi had no idea what further action the IRS would take after his phone call to Rentka on October 31, 1989.

26. The deposition of Robert Rentka was taken on December 16, 1991 and is part of the record in this case. Rentka is a taxpayer service representative in the Pittsburgh IRS District, takes 50–100 calls a day, and has no recollection of receiving a call from Mevi. Rentka Depo. at 11, 24–28. He testified that there are circumstances when a particular assessment would not be on the computer records. The specific assessment made in this case against Miller was a non-master file assessment and therefore would not have been in the computer records on October 31, 1989. Moreover, it would not even appear on microfilm at the Philadelphia Service Center. Rentka Depo. at 32–35.

27. The deposition of the group manager for taxpayer services in the Pittsburgh district office, Mary Vojtash, is also part of the record. She testified that it is common that certain records of assessments are not found on the computer. Vojtash Depo. at 15. Since the assessment made against the plaintiff was a non-master file, there would be no computer record of it when Mevi called on October 31, 1989. Vojtash Depo. at 15–16, 21–22. A record of such assessments does not appear in the computer until the final computer notice is sent to the taxpayer and the matter is referred to the collection division. Vojtash Depo. at 16. Because it is never a part of the computer record, whether or not a notice of deficiency is sent before an assessment is made cannot be determined by a taxpayer service representative on the computer. Vojtash Depo. at 26–30.

28. A telephone service representative cannot speak to an attorney about a taxpayer's account unless the computer shows that there is a power of attorney on file. Vojtash Depo. at 10–11. However, if a telephone service representative cannot find any information on the computer, the representative should then ask the taxpayer "would you like me to send this for further research?" Vojtash Depo. at 32.

The request is then referred to the written accounts department to do the research, and whatever information they find is communicated, usually in writing, to the taxpayer. Rentka Depo. at 54. In this case since there was no computer record of either Miller or the assessment, there was no way for the telephone service representative to verify to whom he was talking. Therefore, the telephone representative could not call Mevi back with any information about Miller since it would be a violation of the disclosure provisions of the Internal Revenue Code § 6103 to do so and would subject Rentka to criminal and civil fines. However, if the request had been referred to the written accounts department, they would have discovered Mevi's power of attorney on file and the lack of statutory notice sent to plaintiff in this case, and could have contacted Miller with this information about the assessments.

29. The call to Rentka by Mevi occurred on October 31, 1989. On November 27, 1989 the Philadelphia Service Center sent the plaintiff a third notice requesting payment of the tax liabilities. Ex. B–33. Neither the plaintiff, Mevi, Korsmoe, nor Brookes made any calls or attempted to communicate with the IRS as a result of this third notice.

30. On January 8, 1990 the Philadelphia Service Center sent a fourth notice to Miller. Exs. A–17, B–25. This letter informed the plaintiff that this would be the final notice before enforcement action would be taken and that a Notice of Federal Tax Lien could be filed which constitutes a public notice to his creditors that a tax lien existed against his property.

31. The collection of these tax liabilities by the Philadelphia Service Center was transferred to the Collection Division in the San Jose District on April 9, 1990 and assigned to Revenue Officer Kenneth Whitmore. This was the first any IRS officer was assigned the collection of these taxes. Whitmore received only a Taxpayer Delinquency Account ("TDA") card for each period with respect to Miller. Ex. A–3.

32. The TDA card shows information about the liability the revenue officer is

assigned to collect, including the following: name of taxpayer, social security number, type of tax, date assessed and amount, and whether or not the liability had been manually assessed, meaning it was a non-master file account. There is nothing on the TDA card which shows any events that occurred before the assessment was made; why the assessment was made; or whether a statutory notice of deficiency was mailed to the taxpayer.

33. On April 15, 1990, Mevi ordered a transcript of Miller's tax records from the Fresno Service Center. The transcript failed to show any information about Miller's tax liability in this case even though the assessment was entered into the IRS computer system on March 5, 1990. Exs. A–23, A–17.

34. On April 25, 1990 Whitmore requested the automatic lien system to file a notice of tax lien. This is a normal and routine practice in all collection cases. Ex. B–8.

35. On April 26, 1990 Whitmore along with Revenue Officer Jules Tupaj attempted to interview the plaintiff at his residence. Tupaj was assigned the collection of certain unrelated income tax liabilities. Whitmore told the plaintiff that he was there to collect the 1042 income taxes assessed against him. The plaintiff told Whitmore he would not discuss those tax liabilities. The plaintiff did not tell Whitmore that the Philadelphia Service Center could find no record of the assessments or that plaintiff had not received a statutory notice of deficiency.

36. Whitmore was never contacted after April 26, 1990 by either Miller, Mevi, Brookes, or any other representative of Miller. No one ever told or suggested to Whitmore that there was anything wrong or incorrect about the assessment. Whitmore was not told by either Miller or his representatives that a 90–day letter had not been received.

37. Despite having requested the automatic lien system to file a notice of tax lien, Whitmore discovered on May 1, 1990 that no such lien had been filed. Accordingly, a notice of tax lien was manually filed on May 1 and the automatic lien system filed a duplicate lien on May 17, 1990. Exs. B–5, B–6.

38. Whitmore took no other collection action in this case. He was on annual leave from July 24 to August 6, 1990. Upon his return, he learned that the notices of tax lien had been released and assessments were going to be abated. He had no further involvement with the case after that time.

39. Whitmore was the only collection officer ever assigned to collect these taxes. During the time he was responsible for collecting the taxes, he neither saw, read, nor heard anything which indicated to him that there was something wrong about the assessment. He never talked to Mevi, Brookes or any other representative of Miller about the 1042 tax liabilities.

40. Unless shown otherwise, revenue officers assume that the examination division has followed all proper procedures before an assessment is made. Revenue officers do not search for notices of deficiency after they receive a case and before they commence collection activity.

41. Miller came into the offices of the Collection Division during the first week of May to deliver to Revenue Officer Tupaj a power of attorney relating to both the income and 1042 tax liabilities. Ex. B–36. Miller said nothing to Tupaj about the 1042 tax liabilities. Tupaj called Brookes on May 10, 1990 to discuss the income tax liabilities. Brookes told Tupaj he would not discuss the 1042 tax liabilities with him, he would discuss them only with Whitmore. Brookes did not tell Tupaj that anything was wrong with the 1042 return assessments. Brookes never called Whitmore.

42. No action was taken by the plaintiff or his representatives to contact the IRS between October 31, 1989 and June 5, 1990. On June 5, 1990, Brookes wrote a letter to the IRS requesting that a copy of the notice of deficiency sent to his client be sent to him. If no notice of deficiency had been sent, he requested that the assessment be abated. Ex. B–9.

43. This letter was routed to Perry Foster, Deputy Regional Counsel in charge of general litigation matters. Foster did not know nor had he ever met Brookes. Foster assigned his staff attorney, Helen Winnick, to investigate the matter. As a result of her investigation, as well as phone calls Foster personally made to the District Counsel in Philadelphia, Pennsylvania for assistance, Foster determined on July 27, 1990 that a notice of deficiency had not been mailed to the plaintiff before the assessment was made. He also determined that a notice of deficiency was required to be mailed before an assessment in this case could properly be made. As a result of his investigation, Foster determined that the tax liabilities were legally unenforceable. He immediately directed the IRS to release the notices of tax lien and abate the assessments. The notices of tax lien were released the same day that Foster determined the liens were legally unenforceable, July 27, 1990. Ex. B–13. The assessment was eventually abated by the Philadelphia Service Center on August 30, 1990. Ex. B–14.

44. Foster made this decision without the prior approval or discussions with Ben Sanchez, the Regional Counsel for the Western Region. Foster called Brookes on July 27 to inform him that the liens were being released and assessments abated.

45. After the liens had been released, Brookes charged in letters sent to Foster that agents of the IRS should be investigated for possible criminal violations as it relates to the assessment made against Miller. Foster investigated the matter and determined that no employee of the IRS intentionally subverted the procedures of the IRS with respect to what happened in this case.

46. In a letter addressed to Brookes, Foster indicated that Miller had satisfied all administrative prerequisites to Internal Revenue Code § 7433. Ex. A–40.

## CONCLUSIONS OF LAW

1. This court has jurisdiction over this action by reason of the explicit grant of jurisdiction under 26 U.S.C. §§ 7432 and 7433.

2. The United States, as a sovereign, is immune from suit without its consent and that the terms of its consent define the court's jurisdiction. *United States v. Sherwood*, 312 U.S. 584, 586, 61 S.Ct. 767, 769, 85 L.Ed. 1058 (1941). Any waiver of the United States' immunity must be explicit and is to be strictly construed. *See e.g., Lehman v. Nakshian*, 453 U.S. 156, 160–161, 101 S.Ct. 2698, 2701–2702, 69 L.Ed.2d 548 (1981).

3. Sections 7432 and 7433 are clear waivers of sovereign immunity.

4. Plaintiff's first claim is brought under section 7432 which provides in pertinent part:

(a) In General.—If any officer or employee of the Internal Revenue Service knowingly, or by reason of negligence, fails to release a lien under section 6325 on property of the taxpayer, such taxpayer may bring a civil action for damages against the United States in a district court of the United States.

(b) Damages.—In any action brought under subsection (a), upon a finding of liability on the part of the defendant, the defendant shall be liable to the plaintiff in an amount equal to the sum of—

(1) actual, direct economic damages sustained by the plaintiff which, but for the actions of the defendant, would not have been sustained, plus

(2) the costs of the action.

    \*      \*      \*      \*      \*      \*

(e) Notice of Failure to Release Lien.—The Secretary shall by regulation prescribe reasonable procedures for a taxpayer to notify the Secretary of the failure to release a lien under section 6325 on property of the taxpayer.

5. Section 6325 provides:

(a) *Release of Lien.*—Subject to such regulations as the Secretary may prescribe, the Secretary shall issue a certificate of release of any lien imposed with respect to any internal revenue tax not later than 30 days after the day on which—

(1) *Liability satisfied or unenforceable.*—The Secretary finds that the liability for the amount assessed, together with all interest in respect thereof, has been fully satisfied or has become legally unenforceable.

6. In addition, Section 7432(d)(1) contains an exhaustion requirement:

A judgment for damages shall not be awarded under subsection (b) unless the court determines that the plaintiff has exhausted the administrative remedies available to such plaintiff within the Internal Revenue Service.

26 U.S.C. § 7432(d)(1).

■ 7. In its May 6, 1991 opinion, this court noted that the Secretary of the Treasury had failed to adopt a procedure for a taxpayer to notify the Secretary of the IRS' failure to release a lien under section 6325.[1] Opinion at 7. Because no regulations had been promulgated, plaintiff could not possibly have been on notice of what he was required to do in order to exhaust his administrative remedies. In the absence of regulations, any action by plaintiff which reasonably could be said to have put the IRS on notice of the unenforceability of the liens on plaintiff's property may have been sufficient to satisfy the exhaustion requirement of section 7432(d)(1). Plaintiff's June 5, 1990 written request for a certificate of release of lien satisfied the requirement that he exhaust his administrative remedies and entitles plaintiff to bring suit for damages under section 7432.

8. Section 7432 contemplates that if an IRS employee knowingly or negligently acts to obstruct the Secretary from making a finding under section 6325, the aggrieved taxpayer is entitled to bring an action. Therefore, the only question remaining is whether the IRS knew that the lien on Miller's property was legally unenforceable *before* it was so informed on June 5, 1990.

Once the IRS learned that the lien on Miller's property was legally unenforceable, it had thirty days to release the lien.

■ 9. The government concedes it made a mistake. A notice of deficiency was not sent to the plaintiff before an assessment was made. The IRS administrative file was mistakenly sent to the Philadelphia Service Center for the issuance of a 30-day letter and notice of deficiency. It turns out that the Philadelphia Service Center only assesses 1042 tax return liabilities, it does not issue notices of deficiency with respect to those liabilities. As soon as the Office of IRS Regional Counsel determined on July 27, 1990 that no notice of deficiency had been issued by either the Philadelphia Service Center or the San Jose or San Francisco IRS Districts and therefore the tax liabilities were legally unenforceable, the liens were released that day and assessments subsequently abated.

10. There were only five occasions between September 4, 1989, when the assessment was made, and June 5, 1990, when the plaintiff or his representatives were in contact with officers or employees of the IRS. They were the following:

(1) October 31, 1989 call from Ed Mevi to Robert Rentka.

(2) April 26, 1990 conversation between the plaintiff and revenue officers Kenneth Whitmore and Jules Tupaj.

(3) May 2, 1990 meeting between plaintiff and Jules Tupaj.

(4) May 10, 1990 telephone call between Jules Tupaj and Lawrence Brookes.

(5) May 1990 telephone call between Lawrence Brookes and Donald Kihara.

11. The Court concludes that none of these events triggered the statutory obligation under section 6325 to release the tax liens or liability under section 7432 for the failure to release the tax liens after the

---

**1.** Since that time the Secretary of the Treasury has issued proposed regulations regarding § 7432; those regulations are not yet in effect. 56 Fed.Reg. 28,840 (1991) (to be codified at 26 C.F.R. Part 301) (proposed June 25, 1991). However, the court's holding would be the same under the proposed regulations. The exhaustion requirement in the proposed regulations,

§ 301.7432–1(e), provides that no civil action shall be brought in federal district court under § 7432 unless the aggrieved taxpayer has sent a written request for damages to the district director. Plaintiff's June 5, 1990 letter requesting a certificate of release of lien satisfies that requirement.

expiration of the 30–day period required in section 6325.

12. In the call by Mevi to Rentka, Rentka accurately informed Mevi that there was no record of plaintiff or the assessments in the computer records. Mevi made no request to Rentka to either release any liens or abate any assessments. This call did not put the IRS on notice that a statutory notice of deficiency had not been sent since the computer records do not show whether a notice of deficiency was mailed or not.

13. The conversation between the plaintiff and Revenue Officer Whitmore on April 26, 1990 did not trigger any obligation or liability under sections 6325 or 7432 because the plaintiff refused to talk about the 1042 tax return liabilities.

14. Similarly, the plaintiff's meeting on May 2, 1990 with Revenue Officer Tupaj or the revenue officer's call to Brookes did not trigger liability under section 7432 because nothing was said about the 1042 income tax liabilities.

15. Finally, the telephone call between Brookes and Kihara did not trigger liability because it was only a call seeking information. There was no request made by Lawrence Brookes for liens to be released or assessments abated.

16. The event that triggers liability under sections 6325 and 7432 occurred in this case on July 27, 1990, the same day the notices of tax lien were released and the instructions to abate the assessments given. Consequently, the IRS complied with section 6325 and therefore no liability arises under section 7432.

17. The third cause of action is brought by plaintiff under 26 U.S.C. § 7433, which provides in pertinent part:

IRC § 7433. CIVIL DAMAGES FOR CERTAIN UNAUTHORIZED COLLECTION ACTIONS.

(a) In General.—If, in connection with any collection of Federal tax with respect to a taxpayer, any officer or employee of the Internal Revenue Service recklessly or intentionally disregards any provision of this title, or any regulation promulgated under this title, such taxpayer may bring a civil action for damages against the United States in a district court of the United States. Except as provided in section 7432, such civil action shall be the exclusive remedy for recovering damages resulting from such action.

18. Section 7433 was also enacted into law in the Technical and Miscellaneous Revenue Act of 1988. The House Conference Committee clearly delineated when section 7433 would apply as well as when it would not: (See 6 U.S. C.C.A.N. 5048, 5289 (1988))

The conference agreement follows the Senate amendment, with several modifications. First, the right to sue authorized by the provision is limited to allegations of reckless or intentional disregard by an IRS employee. An action may not be brought under this provisions alleging mere negligence or carelessness on the part of an IRS employee. Second, the provision is limited to reckless or intentional disregard in connection with the collection of tax. An action under this provision may not be based on alleged reckless or intentional disregard in connection with the determination of tax. Third, the provision is limited to reckless or intentional disregard of the Internal Revenue Code and the regulations thereunder.

19. The making of an assessment is *not* a "collection activity" within the meaning of Section 7433. An "assessment" is the formal recording of a taxpayer's tax liability, and establishes a taxpayer's liability in acting as "a judgment for the taxes found due." Secs. 6303(a), 6321, 6331; *Bull v. United States*, 295 U.S. 247, 259, 55 S.Ct. 695, 699, 79 L.Ed. 1421 (1935). An assessment is a determination of tax liability which must precede any collection action by the IRS (*i.e.*, notice and demand for payment, the filing of a notice of tax lien and notice of levy, and actual levy by seizure and distraint). The legislative history to Section 7433 makes clear, however, that damages may not be based on alleged or intentional disregard in connection with the determination of tax.

■ 20. With respect to plaintiff's claim for damages under section 7433, the Court finds that no officer or employee of the IRS recklessly or intentionally disregarded any provision of the Internal Revenue Code or regulations with respect to collection of the taxes assessed against the plaintiff.

21. Only one revenue officer, Kenneth Whitmore, was assigned the collection of the taxes at issue here. He attempted to interview the plaintiff on April 26, 1990 and caused a notice of tax lien to be filed on May 1, 1990. He took no other collection activity. There was nothing unusual about attempting to interview a taxpayer or filing a notice of tax lien in a collection matter. In fact, it is the custom and practice of all revenue officers to take such actions. No provision of the Internal Revenue Code or regulation was disregarded by Whitmore in his attempt to collect the taxes assessed against plaintiff.

22. The revenue officer was not put on notice by anything in the TDA or computer printouts he received or conversation he had with the plaintiff on April 26, 1990 that anything was wrong with the assessments he was assigned to collect.

23. The plaintiff attempted to establish at trial that various IRS employees incorrectly filed out internal processing forms as they related to the plaintiff. There was no evidence that any forms were incorrectly filled out. Janich and Reuter were correctly advised that the Philadelphia Service Center processed all 1042 tax returns. Ex. A–29. Janich and Reuter mistakenly believed that since the Philadelphia Service Center processed 1042 tax returns, the Service Center would therefore also mail the appropriate 30 and 90–day letters before any assessment was made. It turns out they were wrong in making that assumption. In any event, the provisions of the internal revenue manual do not create protection for the rights of taxpayers and their representatives. Rather, they are designed to enhance administrative efficiency and expedite investigations. They cannot serve as a basis for a damage action. *United States v. DERR*, 968 F.2d 943, 946 (9th Cir.1992).

24. The plaintiff also claimed at trial that employees of the IRS intentionally subverted the procedures of the IRS to cause an assessment to be made against plaintiff without mailing him a 90–day letter. There is no evidence that such a conspiracy ever existed or to that any IRS employee or officer intentionally subverted any procedure of the IRS. No one suggested to Janich or Reuter how to process the case or to which service center is should be sent. That was a decision solely made by Janich based upon a good faith belief at the time that since all 1042 tax returns must be sent to the Philadelphia Service Center for processing, the Service Center would send out the appropriate 30 and 90–day letters. She was not mistaken in believing that the Philadelphia Service Center processes all 1042 tax returns. The only mistake was assuming that they also mailed out the 30 and 90–day letters. There is no evidence that Janich made her decision to send the tax returns to the Philadelphia Service Center with the intent to deny to the plaintiff the right to receive a 90–day letter before an assessment was made or that she did it for any improper purpose.

25. The court finds that plaintiff has failed to meet its burden of establishing liability under either section 7432 or 7433 of Title 26.

## PLAINTIFF'S POST–TRIAL MOTION TO REOPEN

After the close of trial, plaintiff moved to reopen for additional testimony relating to a Notice of Deficiency issued post-trial. Plaintiff offers to show that the new Notice of Deficiency is for an amount substantially less than proposed by agent Tamaki and that it demonstrates the agent's intent and lack of credibility. Plaintiff claims that this new Notice is also erroneous and that the actions leading up to its issuance will show bad motive on the part of IRS.

■ A motion to reopen is addressed to the sound discretion of the trial court. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 331, 91 S.Ct. 795, 802, 28 L.Ed.2d 77 (1971). The court should take

into consideration the nature of the proposed testimony and the effect of granting the motion, including prejudice to the opposing party. *S.E.C. v. Rogers*, 790 F.2d 1450, 1460 (9th Cir.1986).

█ Even if plaintiff is able to elicit the testimony he proposes, in light of the above findings it is difficult to see how it would change the result. The evidence does not go to the issue of the failure to release the lien in question. Nor does it go to the issue of whether there was any wrongful conduct in the "collection" of taxes in connection with any claim *now* before the court. Whether it forms the basis for any new claim this court would not opine; that is not before this court. Accordingly, since even if the testimony were admitted it would not be likely to change the result reflected in this Order, the court exercises its discretion to deny the motion.

## CONCLUSIONS

For the reasons set forth above, plaintiff's claims under 26 U.S.C. §§ 7432 and 7433 are DISMISSED, motion to reopen is DENIED, and judgment will be entered accordingly.

IT IS SO ORDERED.